UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISIONAL AREA



FILED

04 MAY 24 AM 8:32

U.S. DISTRICT COURT
N.D. OF ALABAMA

BRAD LEDBETTER, on behalf of himself and
all others similarly situated,

                      Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

                      Defendant.

No.            CV-04-CO-1066-W

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE SHERMAN ACT
AND CLAYTON ACT

---

        Plaintiff, by his attorneys, alleges his complaint, upon knowledge with respect to his own

acts and upon information and belief with respect to all other matters, as follows:

## I.    INTRODUCTION

        1.       On a Saturday afternoon in November, two Division I-A college football teams

meet for a game. The stadium, seating more than 100,000 fans and the envy of many

professional teams, is full of paying customers.[1] Television cameras line the field, broadcasting

the game to a nation-wide audience as part of a multi-million dollar television contract. The

home field stands are filled with fans wearing college-licensed gear, everything from t-shirts,

hats, jackets, and jerseys to blankets and seat cushions, all of which earn the school hundreds of

thousands of dollars in licensing fees and royalties.[2]

        2.       In "big-time college football," as National Collegiate Athletic Association

("NCAA") Division I-A football is referred to, some people on the field command enormous

---

[1] *See* "NCAA Accumulated Attendance Report: Average [Football] Attendance, Division I-A," June 2, 2002, published at www.ncaa.org/stats/football/1/2002/attendance/IA_AVGATTENDANCE.pdf. At least 4 teams, Michigan, Penn St., Tennessee, and Ohio State, averaged over 100,000 attendees at home games in 2002.

[2] *See* "2002-03 Postseason Football: 5 Year Summary of Gross Receipts," published at www1.ncaa.org/membership/postseason_football/sum_grossreceipts.pdf. Television, corporate sponsorship, merchandising, and licensing alone raised over $60 million in revenue *for the four BCS games alone.*

salaries. For example, the head coaches may each earn more than one million dollars for the year. The many assistant coaches also may earn substantial salaries.[3]  Whatever they earn is the product of unrestrained competition between schools to attract the best coaches. Other people on the field, mostly students, will also be compensated for their role in bringing the game to life, but at a more modest level. Student ushers, concession workers, and program sellers, for example, will be paid an hourly wage for their efforts.

3.     Then there are the participants in the game itself, the athletes whom the fans have come to see perform. In addition to the star players who will go on to play professionally, there are dozens of highly skilled athletes who rarely get their names mentioned in the newspaper, but who are nonetheless essential to the success of the team. These key participants, as explained below, have their compensation restrained by agreements between the NCAA and Division I-A schools.

4.     Each of the players on the roster has contributed to the preparation for that afternoon's game. In addition to 20 hours of intense practice on the field the previous week, each player has participated in "voluntary" weight-lifting and conditioning sessions, hours of studying film of the opposing team, and additional hours studying scouting reports and play assignments.[4]  Although NCAA rules limit the number of players that a Division I-A team may place on its pre-season practice roster, the NCAA does not limit the size of a Division I-A football team during the regular season.[5]

5.     The majority of these players are compensated, though not in proportion to the revenues they generate, for their on-field and off-field efforts in building a winning football

---

[3] *See* "College Football Coaching Contracts Filled with Lucrative Incentives," Sports Illustrated, December 23, 2003, published at http://sportsillustrated.cnn.com/2003/writers/mike_fish/12/19/coaching.contracts/.

[4] *See* "2003 American Football Coaches Association Survey [of Division I-A College Football Players]," at 59-60, published at www.afca.com/pdf/2003_Player_Survey.pdf. The survey found that 88% of students reported at least a 20-hour per week time commitment to football during the season, and 28% reported at least a 30-hour per week time commitment. *See also* NCAA Bylaws § 17.11.2; 17.11.6 (discussing limits on athletically related activities).

[5] NCAA Bylaws § 17.11.2.1.1 (Limit on Number of Participants, Division I-A).

team. By the rules of the NCAA, "student-athletes" may receive full athletic scholarships from their schools – including payment of full academic tuition, room and board, books and incidental expenses – without losing their "amateur" status.[6] This rule is not at issue in this lawsuit.

6.    However, the NCAA and Division I-A schools have jointly and collectively entered into another agreement or "rule" which artificially restrains the number of scholarships that a school may award to football team roster members. Although prior to 1977 there was no restraint whatsoever on the number of football scholarships a school could award, the NCAA and its Division I-A members have jointly acted to steadily reduce and restrain the maximum number of football players that may be placed on scholarship as set forth below:

| Year | Agreed Scholarship Restraint |
|------|------------------------------|
| Prior to 1977 | No scholarship limits |
| 1977-1991 | 95 scholarships |
| 1992 | 92 scholarships |
| 1993 | 88 scholarships |
| 1994-Present | 85 scholarships[7] |

7.    During the last ten years, the size of the average Division I-A football roster has remained at approximately 117 players.[8] In the name of "cost-containment," however, as noted above the NCAA and its Division I-A members have jointly acted to restrain to 85 the number of players who may receive athletic scholarships.[9] Therefore, the NCAA rules deny scholarships to thousands of Division I-A football players who would otherwise be offered scholarships but for the restraint of trade imposed by the scholarship restriction. Plaintiff is among the thousands of

---

[6] NCAA Bylaws § 15.01.5 (Eligibility of Student-Athletes for Institutional Financial Aid).

[7] NCAA Bylaws § 15.5.5 (Football Limitations); *see also* Walter Byers, *Unsportsmanlike Conduct: Exploiting College Athletes*, University of Michigan Press, 1995, at 223-231.

[8] *See* "1982-2002 Sponsorship and Participation Report," at 61-62, published at www.ncaa.org/library/research/participation_rates/1982-2002/participation.pdf.

[9] NCAA Bylaws § 17.11.2.1.1 (Limit on Number of Participants – Division I-A); NCAA Bylaws § 15.5.5 (Football Limitations).

college football players who over the past four years have been denied one or more years of funding for a scholarship because of the NCAA's 85-scholarship limit. This class of student-athletes, also known as "walk-ons," worked as hard and devoted as many hours to the team as their compensated teammates. They are on the team's roster and play and practice as any other player does, but do not have scholarships due to the NCAA restraint.

8.      Had the NCAA and Division I-A members not agreed to impose the scholarship restraint, free and open competition for walk-ons would have occurred, as it did prior to the restraint, and those walk-ons who were members of a team's roster would have received scholarships. Absent the restraint, as schools began to offer more scholarships to gain a competitive edge, others would have matched or exceeded their competitor's behavior. As a result of such free and open competition, NCAA Division I-A schools would have had complete rosters of scholarship players many years ago. But for the NCAA restraint/scholarship limit, every Division I-A school has avoided paying any compensation to an average of thirty-two of these football players each year per Division I-A school.[10]

9.      Although the NCAA proclaims such restrictions are necessary to contain costs, with respect to other inputs to Division I-A football, where free competition exists, schools are increasing payments for these inputs. Coaches' salaries are a prime example as they have risen dramatically in recent years as schools compete for the best coaches. Although the costs of certain unrestrained inputs have increased, revenues have increased in many cases at a faster rate. The competition with respect to inputs like coaches exists because schools believe that a better coach produces a better product which in turn brings in more revenue to the school. This is classic behavior of economic competitors competing for market share.

10.     The NCAA's artificial limit on the number of football scholarships is classic cartel behavior. The NCAA and its member institutions control big-time college football. The

---

[10] *See* "1982-2002 Sponsorship and Participation Report," *supra* note 8 at 61-62 (indicating that in 2001-02 the average squad size for a Division I-A college football team was 117.5).

NCAA uses that control to maximize revenues and minimize costs. According to the NCAA's own figures, Division I-A schools earned on the average $25.1 million in athletic revenue in 2003, up from $13.6 million in 1993.[11] The agreed restrictions on football scholarships have allowed Division I-A schools to generate that revenue at a lower cost, but at the expense of the class of "walk-on" players who are excluded from the scholarship system by this horizontal and unlawful restraint of trade.

11.     This complaint seeks declaratory and injunctive relief ending the NCAA and Division I-A restraint in trade artificially limiting the number of Division I-A football scholarships, and seeks damages for the class of student-athletes who were denied grants-in-aid as a result of the unlawful horizontal restraint of trade.

## II.     JURISDICTION AND VENUE

12.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

13.     Defendant transacts business and is found in this District. In particular, the NCAA has sanctioned athletic contests in this District and has derived millions of dollars in revenue as a result of those athletic contests. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was, and is, carried out in part within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District. Venue in this District is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

## III.     DEFINITIONS

14.     As used in this Complaint, the following terms are defined as:

---

[11] *See* "Revenues and Expenses of Division I and II Intercollegiate Athletics Programs: Financial Trends and Relationships – 2001," Daniel L. Fulks, Ph.D., CPA, at 10.

(a)    "Roster" refers to the participants on a Division I-A football team as set forth in the NCAA Division I Manual ("the Manual");[12]

(b)    "Athletic scholarships" refers to the full amount of grants-in-aid provided to Division I-A football players, including tuition, room, board, books and any incidental expenses permitted by the Manual;[13]

(c)    "Walk-ons" are Division I-A football roster players who are not initially given a scholarship; walks-ons can either be "recruited" or "non-recruited" according to the Manual;[14]

(d)    "Division I-A" is the group of 117 "big-time" college football schools which have met the NCAA criteria set forth in the Manual, including average attendance greater than 17,000 at football games or a football stadium with a capacity of 30,000 permanent seats.[15] Division I-A is a "football only" subdivision of NCAA Division I.

## IV.    THE PARTIES

15.    Plaintiff Brad Ledbetter is a graduate of the University of Alabama who was a roster member of the 1996-2000 football teams, but did not receive an athletic scholarship until the 1999-2000 season. Plaintiff played football at Pelham High School. He enrolled at the University of Alabama. Plaintiff and other walk-ons were told that if they played well enough they could become scholarship players. Plaintiff played as a walk-on. As a walk-on, not only did he not receive scholarship money, he also was subject to less favorable training conditions

---

[12] *See* NCAA Bylaws § 15.5.9.2: "**Squad-List Form.** The member institution's athletics director shall compile a list … of the squad members in each sport on the first day of competition …."

[13] NCAA Bylaws § 15.02 (Definitions); 15.1 (Maximum Limits on Financial Aid); 15.5.5 (Football Limitations) (attached as Exhibit A).

[14] NCAA Bylaws § 15.01.8 (Nonrecruited Student Athlete); 15.5.5.3 (Initial Counters – Football (*see* Exhibit A).

[15] *See* "2003 Listing of All Teams in I-A," published at web1.ncaa.org/d1mfb/Internet/team/IA_team.pdf; *see also* "2003 NCAA College Football Attendance," published at www.ncaa.org/stats/football/attendance/2003/2003footballattendance.pdf; NCAA Bylaws § 20.9.6.3 (Football Attendance Requirement [I-A] – Effective August 1, 2004).

(*e.g.*, "access to the same training table as scholarship players"). Brad was a starting player throughout his career, and was team captain for the 2000 season.

16.     Plaintiff's playing experience is typical of other Division I-A walk-on players.

17.     The National Collegiate Athletic Association is a private association of more than 1,200 institutions of higher education. The NCAA regulates college athletics on behalf of its member schools. It is headquartered in Indianapolis, Indiana. Its revenue for 2003 was $438 million.

## V.     CO-CONSPIRATORS

18.     Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators whose identities are presently known include, but are not limited to, the following: The approximately 117 colleges that participate in NCAA Division I-A football.[16] Representatives of those schools serve on NCAA committees which promulgate rule changes. Representatives of those schools voted to adopt the changes to the NCAA rules limiting Division I-A scholarships and thus agreed to impose the restraint on trade described herein. All Division I-A schools continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraint.

## VI.     CLASS ACTION ALLEGATION

19.     Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(1), (2) and (3) for violations of, *inter alia*, 15 U.S.C. §§ 1 and 2. The class is comprised of all students who were on the football rosters of NCAA Division I-A schools, but who did not receive a full grant-in-aid from their school. The "Class Period" is the last four years to the present.

---

[16] *See supra* note 1 and note 15.

20.     The NCAA scholarship limit rule has harmed and continues to harm the interests of thousands of Division I-A football players throughout the United States.[17]  The members of the Class are so numerous that joinder of all members is impracticable.

21.     Defendant's relationships with the Class members and its enforcement of the horizontal restraint of trade with respect to Class members have been substantially uniform. Questions of law and fact will predominantly be common to the Class.

22.     Plaintiff has no conflicts of interest with Class members and has retained counsel competent and experienced in class actions and federal and state antitrust litigation.  Plaintiff and his counsel will fairly and adequately represent the interest of the Class.

23.     Defendant has acted, continues to act, refused to act and continues to refuse to act on grounds applicable to the Class, thereby making profitable final injunctive relief with respect to the Class as a whole.

24.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by members of the Class are small in relation to the expense and burden of individual litigation, and therefore it is highly impractical for such Class members to attempt redress of the wrongful antitrust violations individually.  There will be no extraordinary difficulty in the management of this Class action.  Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class:

(a)     Whether the NCAA has a uniform rule prohibiting any of its Division I-A member schools from awarding more than 85 football scholarships at a time?

(b)     Whether the NCAA has market or monopoly power in the relevant market for NCAA Division I-A football?

---

[17] *See* Sponsorship and Participation Report, *supra* note 8, at 61-62 (indicating that in 2001-02, 13,513 students participated in Division I-A college football, with an average squad size of 117.5).

(c)     Whether the NCAA and its member schools have imposed a horizontal restraint of trade that is unlawful under the Sherman Act?

(d)     Whether the NCAA has abused its monopoly in the relevant market by imposing the 85-scholarship limitation?

(e)     Whether students who were denied scholarship aid as a result of the NCAA limitation were injured in their business or property?

(f)     What is the appropriate form of injunctive/declaratory relief?

(g)     What is the appropriate measure of damages?

## VII.   RELEVANT MARKETS

25.     The relevant market in this case is NCAA Division I-A football. It has unique characteristics which distinguish it from other athletic entertainment.

26.     Division I-A football comprises a field of competition composed of at least 117 similarly situated football programs. These programs vigorously compete with each other in the recruiting of student-athletes and succeeding in such competition is considered the hallmark of the more successful teams and coaches. The Division I-A football market includes a pool of student-athletes who are talented enough and otherwise eligible to play Division I-A college football.

27.     Division I-A college football has features distinguishing it from any other Division of college football because of the strict requirements set forth in the NCAA Manual, including a minimum total number of athletic teams, a minimum average attendance of 17,000 at football games, and a minimum football stadium capacity of 30,000.

28.     The NCAA itself promotes and treats NCAA Division I-A football as a unique market and a separate form of entertainment in terms of advertising, promotion and rules.

29.     Division I-A is also different from professional football in that its players are not paid a salary, and indeed the NCAA distinguishes its football players from the National Football League ("NFL") on this basis. The NCAA refers to Division I-A college football players as

"amateurs" although as noted above most of the players are "compensated" for their efforts through full athletic scholarships.

30.     Talented high school football players who wish to continue to play their sport at a high level of competition have no choice but to play for an NCAA Division I-A team. For example, the collective bargaining agreement between the NFL and the NFL Player's Association prevents any player from entering the NFL draft and playing professional football for a full three years after they exit high school.

31.     The relevant geographic market is the United States. NCAA Division I-A schools are found all across the country. They travel across the country to compete against each other and to recruit promising high school players.

## VIII.   FACTUAL ALLEGATIONS

### A.     The NCAA is a Cartel

32.     The NCAA is an association of member institutions that compete against each other to attract revenues, fans, and athletes. The policies of the NCAA are ultimately controlled by a vote of these members. Thus, the NCAA is actually an integration of the rulemaking and rule-enforcing activities of its member institutions.

33.     The NCAA therefore operates as a classic cartel. It is a combination of producers of a product joined together to control its production, sale, and price.[18] As noted by two scholars, "most economists view the NCAA as a cartel."[19]

34.     The NCAA cartel exercises an almost absolute control over intercollegiate athletics, including Division I-A football. The cartel establishes the dates when playing seasons begin and end, the number of games that may be played, and the number of coaches that a team may employ. It determines all playing rules, sets all eligibility requirements for athletes, controls

---

[18] Black's Law Dictionary, West Publishing Co., Sixth Edition, 1990; *see also* E. Woodrow Eckard, *The NCAA Cartel and Competitive Balance in College Football*, Review of Industrial Organization, Vol. 13 (1998), at 347-49.

[19] *Monitoring Cartel Behavior and Stability: Evidence From NCAA Football*, Humphreys and Rusek (January 2001).

recruiting, and determines the allowable limit of financial aid for student-athletes. The cartel also limits the number of athletic scholarships that each school may offer to qualified student-athletes.

35.    Through the NCAA cartel, NCAA member institutions collude to exercise joint "monopsony" power over college football.[20] In adopting and enforcing the 85-scholarship limit, the NCAA's members have created a horizontal restraint of trade – an agreement among competitors on the way in which they will compete with one another, whereby they have agreed to restrict competition for one of the major inputs to the product.[21]

36.    By artificially restraining the number of scholarships available to otherwise-qualified student-athletes, the NCAA's Division I-A members impose an artificial cost control mechanism on their main input, college football players. This cost control mechanism is imposed with no regard for the differing demand for and value of athletic scholarships that would be present in a competitive market. This cost control mechanism also places an artificial limit on the total number of athletic scholarships available to student-athletes throughout the nationwide market for Division I-A college football.

37.    The NCAA can impose penalties on any member institution that deviates from these controls. In fact, the NCAA cartel commonly uses the scholarship limits themselves as a means to enforce compliance with other NCAA rules. The NCAA enforcement code defines two types of infractions, secondary infractions and major infractions.[22] When either type of

---

[20] Eckard, *supra* note 18, at 347-48.

[21] *See NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984) (invalidating NCAA limitations on television contracts, finding that "[b]y participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint – an agreement among competitors on the way in which they will compete with one another"); *Law v. NCAA*, 134 F.3d 1010, 1024 (10th Cir. 1998) (upholding summary judgment for assistant basketball coaches who challenged the NCAA's salary cap on assistant coaches, finding: "The undisputed record reveals that the REC Rule is nothing more than a cost-cutting measure and shows that the only consideration the NCAA gave to competitive balance was simply to structure the rule so as not to exacerbate competitive imbalance. Thus, on its face, the REC Rule is not directed towards competitive balance nor is the nexus between the rule and a compelling need to maintain competitive balance sufficiently clear on this record to withstand a motion for summary judgment.").

[22] NCAA Bylaws § 19.02.

infraction is found, the Vice President for NCAA Enforcement Services and the Committee on Infractions have the discretion to further reduce the number of approved athletic scholarships available to the offending program. For major infractions, a reduction in the number of approved athletic scholarships is a "presumptive penalty."[23] The NCAA cartel has frequently imposed this penalty against Division I-A football programs, even for infractions having nothing to do with the school's use of scholarships.

38.     Up until a few years ago, the NCAA Committee on Infractions could impose severe penalties on institutions found to be cheating on the cartel agreement. These penalties included bans on television and postseason appearances, reductions in the number of scholarships that could be offered, and even the "death penalty," a complete shutdown of an athletic program. All of these penalties carry potentially large economic consequences, given the average size of the payment for an appearance on television or in a bowl game.

39.     Evidence exists suggesting that sanctions imposed for violations of recruiting rules are used to enforce the NCAA cartel agreement. Fleisher, Goff, Shughart, and Tollison (1988) and Fleisher, Goff and Tollison (1992) studied 85 big-time football programs over the period 1953-1983 and found that the probability of a school receiving sanctions to be positively correlated with the variability of an institution's on-field performance in football.

40.     By further reducing scholarship limits as a sanction against programs that violate NCAA rules, the NCAA has further increased the Class of participating Division I-A football players who have been denied athletic scholarships.

**B.      The Commercial Nature of the NCAA and Big-Time College Football**

41.     Division I-A college football generates hundreds of millions of dollars in revenues for the NCAA and its participating institutions. Division I-A college football affects a not insubstantial amount of interstate commerce.

---

[23] NCAA Bylaws § 19.5.2.

42.    Grant-in-aid agreements between student athletes and Division I-A schools represent a commercial or business transaction between the student and the school. In a written contract, student athletes commit to practice and play for a Division I-A school in return for a promise of payment from the school to cover the cost of academic tuition, room and board, books, and a stipend. Grants-in-aid are not awarded for charitable purposes and they are not based on financial need or academic merit. Grants-in-aid are therefore directly related to the NCAA's and the member schools' commercial or business activities in operating big-time college football programs, programs that generate hundreds of millions of dollars in annual revenues.[24]

43.    According to figures published by the NCAA, *postseason* college football alone generated $227,204,568 in total revenues during the 2002-03 season. Of this, $181,721,956 was distributed in "payouts" back to the individual athletic conferences and the participating teams.[25] The Bowl Championship Series ("BCS"), which operates just four postseason bowl games and which controls the Division I-A championship football game, by itself generated $114,724,842 in revenue in 2002-03. That entire amount was distributed back to the Division I-A football conferences.[26]

44.    For Division I-A schools, direct revenue derived from football, which includes (but is not limited to) payments from television contracts, ticket sales, concessions, merchandising, and licensing, represents a substantial majority of all sports related revenues. In 2001, on average every Division I-A school received $10,920,000 in revenue from their football

---

[24] Several prior cases have found that the NCAA's athletic eligibility requirements are exempt from any regulation under the antitrust laws because they are not part of the NCAA's "commercial or business activities" but are instead aimed at maintaining the amateurism of college football. The allegations here are intended to address that line of cases. *See, e.g., Smith v. NCAA*, 139 F.3d 180, 185-86 (3d Cir. 1998) (dismissing antitrust challenge to NCAA eligibility rule barring participation for students who enroll for post-graduate studies in a school other than their undergraduate alma-mater); *Bowers v. NCAA*, 9 F. Supp. 2d 460, 497-98 (D.N.J. 1998) (dismissing challenge to NCAA academic eligibility rules); *Gaines v. NCAA*, 746 F. Supp. 738, 744-45 (M.D. Tenn. 1990) (dismissing antitrust challenge to NCAA eligibility rule regarding loss of eligibility after attempting to enter the NFL draft).

[25] *See* "2002-03 Postseason Football," *supra* note 2, at 1.

[26] *Id*. at 2.

program, representing 69% of all sports related revenue received.[27] This is contrasted with an average of $6,165,000 in total football-related expenses, which represents only 56% of total athletic expenses.[28] In 2001, at least one Division I-A school derived more than $66 million in revenue from its football program, while the largest reported football-related expenses were only $16,022,000.[29] The football revenues of last year's top teams were substantial:

**Football Revenues of 2003 Top-10 Teams, Plus the University of Alabama[30]**

| | |
|---|---|
| USC | $26,778,686 |
| LSU | $39,854,796 |
| Oklahoma | $26,132,466 |
| Michigan | $36,667,585 |
| Texas | $43,765,047 |
| Tennessee | $41,462,602 |
| Ohio State | $52,742,278 |
| Kansas State | $16,969,362 |
| Florida State | $18,714,279 |
| Miami | $21,286,108 |
| Alabama | $18,954,609 |

45.    The NCAA itself accumulates hundreds of millions of dollars in annual revenues, the majority of which it distributes back to its member institutions. According to the NCAA's published year-2004 budget, the NCAA is expecting $452,500,000 in total operating revenue in fiscal year 2004.[31] It plans to distribute $264,239,000 of that back to Division I member schools, and to spend another $46,351,000 in programs and services that benefit those members.[32]

46.    Although the NCAA attempts to claim it is not a "business" subject to the normal rules of law forbidding illegal restraints in trade, the financial numbers associated with Division I-A football prove otherwise. A look at coaches' yearly compensation is just one indicator of the

---

[27] See "Revenues and Expenses of Division I and II Intercollegiate Athletics Programs," supra note 11, at 22.

[28] Id.

[29] Id. at 24, 26.

[30] Source: EADA reports filed with the U.S. Department of Education, Office of Post Secondary Education. Reporting year: 7/1/2002 – 6/30/2003. See http://ope.ed.gov/athletics/Search.asp.

[31] See "The NCAA Revised Budget for Fiscal Year Ended August 31, 2004," published at www.ncaa.org/financial/2003-04_budget.pdf, at 1; see also "2003-04 Budgeted Revenue and Expenses Pie Charts," published at www1.ncaa.org/finance/pie_charts.

[32] See The NCAA Revised Budget," supra note 31, at 6.

business nature of Division I-A football and the competition for one of its inputs when no
restraints are in place:

### $2 million-plus[33]

Bobby Bowden [Florida State]
Mack Brown [Texas]
Bob Stoops [Oklahoma]

### $1.5-$2 million

Barry Alvarez [Wisconsin]
Frank Beamer [Virginia Tech]
Kirk Ferentz [Iowa]
Phillip Fulmer [Tennessee]
Glen Mason [Minnesota]
Mark Richt [Georgia]
Nick Saban [LSU]
John Smith [Michigan State]
Bill Snyder [Kansas State]
Jim Tressel [Ohio State]
Tommy Tuberville [Auburn]

### $1-$1.5 million

Mike Bellotti [Oregon]
Lloyd Carr [Michigan]
Pete Carroll [Southern Cal]
Larry Coker [Miami]
Bill Doba [Washington State]
Ralph Friedgen [Maryland]
Keith Gilbertson [Washington]
Les Miles [Oklahoma State]
Gary Pinkel [Missouri]
Rich Rodriguez [West Virginia]
Frank Solich [Nebraska]
Joe Tiller [Purdue]
Ron Zook [Florida]

### $500,000-$1 million

David Cutcliffe [Mississippi]
Urban Meyer [Utah]
Gary Patterson [Texas Christian]
Mike Riley [Oregon State]

---

[33] Source: Open records request filed by *si.com*, figures include base salary, TV/radio/personal services and
other bonuses.

47.     Competition at the coaches' level is so competitive that in the 2003 season, LSU coach Nick Saban had a clause in his contract which required LSU to renegotiate within 30 days of LSU's victory in the BCS national championship game and pay him "at least $1 more than the highest paid college coach."

48.     In fact, so important is the business of NCAA Division I-A football to Division I-A schools that most coaches are paid far more than university presidents.

49.     As discussed below, in the name of "cost containment" the NCAA has imposed strict limits on the number of and value of athletics scholarships that member schools may grant to student athletes. But the NCAA imposes few other limits on how Division I-A schools can generate and spend football-related revenue. For example, in addition to the revenues derived from football operations directly and the revenues distributed back to the schools by the NCAA, Division I-A schools are free to raise unlimited additional funds from alumni and other sports "boosters." Division I-A schools – and the individual football conferences – also may freely enter into lucrative television and merchandising agreements.

50.     These funds are freely spent. In fact, in recent years major college football programs have spent huge sums on new stadiums and stadium upgrades, new practice and workout facilities, new locker rooms for student-athletes, equipment upgrades, multi-million dollar head-coaching contracts, and a myriad of other expensive facility and program improvements. These escalating expenditures have been dubbed the "arms race" of college football.[34]

51.     For example, the University of Alabama recently spent at least $35 million dollars on a major expansion to its Bryant-Denny stadium. Completed in 1998, this expansion added 13,000 new seats to the stadium. It also included the construction of 85 luxury skyboxes, a new video scoreboard, and the renovation of the luxury "A-Club" room. The new luxury skyboxes

---

[34] *See, e.g., At $26,667 per locker, Ducks land in luxury,* THE SEATTLE TIMES, Sept. 9, 2003, published at www.mercurynews.com/mld/mercurynews/sports/6745325.htm?1c.

now rent for at least $25,000 to $35,000 per year.[35]  The University of Alabama is also raising money to build a state of the art strength and conditioning center, which will include a 30,000-square foot addition to its existing 66,000-square foot Football Building.

52.    Not to be outdone, Auburn University recently completed construction of two expensive new facilities for the football program.  The John H. Watson Fieldhouse indoor practice facility was completed in 1999.  Funded by private donations, the Fieldhouse boasts a 40-yard artificial indoor playing surface for use during football practices.[36]  Auburn also recently dedicated the James T. Tatum strength and conditioning center.  This facility, constructed at a cost of $2.7 million dollars, contains over 14,000 square feet of state of the art athletic training equipment.[37]  As recently as 1987, Auburn University completed multi-million dollar expansion of its own football stadium, adding an upper seating deck to the east side of the stadium and a group of luxury skybox suites.[38]

53.    Such multi-million dollar expenditures are designed to enhance the overall quality of a football program.  They therefore improve the opportunity for a Division I-A program to attract, recruit and retain student athlete participants.

54.    Compared to these massive and unregulated expenditures, grants-in-aid to student athletes comprise only a small percentage of Division I-A schools' overall expenditures on football.  The value of an individual football grant-in-aid varies according to the total cost of attendance at a university, but that value is strictly limited by NCAA regulations.[39]  Increasing grants-in-aid to student athletes would comprise only a modest increase in overall football and athletics related expenses for Division I-A universities.  Any additional expense incurred by

---

[35] *See* "University of Alabama: Bryant Denny Stadium," published at www.thpi.com/bama/bryant-denny.html.

[36] *See* "John H. Watson Fieldhouse," published at www.auburntigers.com/football/page.cfm?doc_id=809.

[37] *See* "James T. Tatum Jr. Strength and Conditioning Center," published at www.auburntigers.com/football/page.cfm?doc_id=399

[38] *See* "Jordan Hare Stadium," published at www.auburntigers.com/football/page.cfm?doc_id=186.

[39] NCAA Bylaws § 15.1 (Maximum Limit on Financial Aid); 15.2 (Elements of Financial Aid).

making student scholarships more freely available would pale in comparison to the massive and unregulated expenditures discussed above.

## C.    NCAA Limits/Restraints on Athletic Scholarships

55.    In the seven decades after the founding of the NCAA in 1906, there were no limits at all on the number of football scholarships that a school could grant.[40]  Some schools granted many scholarships, some schools granted none.  But football players remained eligible for need-based scholarships like any other student.  In 1956, the NCAA formally adopted rules that permitted its members to award scholarships based solely on athletic ability.[41]

56.    Football rosters grew as the NCAA relaxed the rules on substitutions during games.  By 1965, there were no limits on substitutions during games, ushering in the era of specialization in which players specialize in offense, defense, kicking, punting, punt returning, etc.[42]

57.    The first NCAA restraints on the number of football scholarships became effective in 1977 and limited the total number of scholarships to 95.

58.    The NCAA's initial restraints on football scholarships were proposed during a special "Economy Convention" of the NCAA in August 1975.  At that convention, purportedly in order to contain the cost of operating a college football program, the NCAA decided to restrain football programs to 95 scholarships total, with only 25 new scholarships available for every new season.[43]

59.    In 1991, a special "Cost Containment Committee" of the NCAA proposed a further series of measures intended to reduce the costs of operating a big-time college football

---

[40] See Daniel Sutter and Stephen Winkler, *NCAA Scholarship Limits and Competitive Balance in College Football*, Journal Of Sports Economics, 1 February 2003, vol. 4, Iss. 1, pp. 3-18; see also Walter Byers, *Unsportsmanlike Conduct, Exploiting College Athletes*, University of Michigan Press, 1995, at 225-26.

[41] Byers, *supra* note 40, at 70-72.

[42] Byers, *supra* note 40, at 98-99.

[43] Byers, *supra* note 40, at 225-26; *see also* Sutter and Winkler, *supra* note 40, at 1.

program.[44] The NCAA as a whole voted in favor of a set of proposals to be effective starting in 1992. Along with the "Restricted Earnings Coaches" rule change that was found to have violated the antitrust laws in the case of *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998), the NCAA voted to further reduce the number of football scholarships for Division I-A football teams.[45] The maximum number of scholarships dropped to 92 in 1992, 88 in 1993, and 85 thereafter.[46] Today, the maximum number of athletic scholarships a Division I-A school may grant for football remains at 85, although there are currently proposals within the NCAA to further reduce that number to 75. The present scholarship restraints were imposed in an attempt to reduce the costs of operating a big-time college football program, and for no other reason.

60.     The NCAA bylaws require that all grant-in-aid awards to student athletes are limited to one-year's duration.[47] So while Division I-A football players are eligible for four years of active team participation, NCAA rules forbid member institutions from guaranteeing a scholarship to any player for more than one year. Each Division I-A member institution must therefore award each of its approved 85 athletic scholarships on an annual basis.

---

[44] *See Law v. NCAA*, 134 F.3d 1010, 1013-15 (10th Cir. 1998).

[45] *Id.; see also* Byers, *supra* note 40, at 366; NCAA Bylaws § 15.5.5.1. (85-scholarship limit originally adopted in January 1991).

[46] Byers, *supra* note 40, at 366; *see also* "The effects of NCAA rule changes on gridiron success: Did scholarship reductions help the Huskies," published at www.4malamute.com/wwwa9s.html.

[47] NCAA Bylaws:   15.3.3 - Period of Institutional Financial Aid Award

**15.3.3.1: One Year Limit.**  Where a student's athletics ability is taken into consideration in any degree in awarding financial aid, such aid shall not be awarded in excess of one academic year.

**15.3.3.1.1: Financial Aid Authority Precedent.**  A staff member may inform a prospect that the athletics department will recommend to the financial aid authority that the prospect's financial aid be renewed each year for a period of four years and may indicate that the authority always has followed the athletics department's recommendations in the past.  However, the prospect must be informed that the renewal will not be automatic.

**15.3.3.1.2: Injury or Illness Policy.**  It is not permissible for an institution to assure the prospect that it automatically will continue a grant-in-aid past the one-year period if the recipient sustains an injury that prevents him or her from competing in intercollegiate athletics, but an institutional representative may inform the prospect of the regular institutional policy related to renewal or continuation of aid past the one-year period for recipients who become ill or injured during their participation.

**D.    The Economic Effects of the 85-Scholarship Restraint on Walk-On Players**

61.    The 85-scholarship restraint for Division I-A football programs succeeded in lowering the cost of providing big-time college football games.  But while Division I-A schools have, through this joint agreement and cartel action, decreased the costs of one of their key inputs – college football players – they continue to field powerhouse teams and earn ever-increasing revenues.

62.    Division I-A schools can continue to field strong football teams at the 85 scholarship limit in part because "walk-on" players – who receive no compensation as a result of the restraint – fill the rest of the college football roster.[48]

63.    Some, if not most, of these walk-on players are actually recruited by Division I-A college football coaches with the promise of a potential scholarship if they perform well on the field.  Depending on the athlete's subsequent performance and the needs of the team (due to graduation, injuries or early departure from school of scholarship players), a walk-on may be awarded one of the 85 scholarships later in his college football career.

64.    Other walk-ons are not "recruited" according to the technical rules of the NCAA but are welcomed nonetheless by the coaching staff because they serve important roles on the team as a whole.

65.    Walk-ons who earn a spot on the roster play a valuable role in the success of any Division I-A football team, even if they do not play in a game.  During practice, walk-on players may act as a "scout" team and run the plays and formations used by their upcoming opponents.  They permit the coaches to run full contact practices without the risk of injuring key players.  They in essence serve as expendable fodder.  Walk-ons may also specialize in kicking, punting,

---

[48] *See generally Walk-ons make own contributions*, THE DAILY TARGUM, Oct. 2, 2002, published at www.dailytargum.com/news/2002/10/02/Sports/WalkOns.Make.Own.Contributions.....; Adam Porcelli, *Schmidt Adds to The Notre Dame Walk-On Legend*, Sept. 2, 2003, published at und.collegesports.com/sports/m-footbl/spec-rel/090203aae.html.

or punt returning, leaving other players to practice their specialized roles on offense and defense.[49]

66. To fulfill these roles, walk-ons practice just as long and as hard as their scholarship teammates. While NCAA rules limit coach-supervised practice time to 20 hours a week, big-time college football players, whether walk-ons or not, routinely exceed that figure with "voluntary" weight training sessions, game film review, scouting report study and playbook study.[50] In fact, walk-ons may work even harder on and off the field because they are competing for one of the 85 scholarships.

67. Some walk-ons work so hard that they become key players on their teams, sometimes even earning starting positions over other players who have been awarded scholarships.

68. The enormous year-round expenditure of time required for participation in Division I-A football often precludes other employment during a walk-on's college career. Even if college football players could find the time to work, NCAA rules limit the types of jobs players can perform and the total amount of compensation they may receive. As a result, many walk-ons leave school with enormous student loans that they must pay off after they leave school.

69. Whether or not they are forced to take out student loans to pay for their college education, walk-ons are deprived of the value of a full grant-in-aid by the NCAA's artificial restriction on the number of scholarships that a Division I-A school may award.

70. Walk-on students are also required to adhere to many if not all of the same restrictions that the NCAA and its member institutions impose on scholarship players. These

---

[49] *See generally Walkabout, Linebacker Fulfills Dream to Start for Nebraska*, The Daily Californian Online, Sept. 9, 1999, published at www.dailycal.org/article.php?id=238 ("Much of the programs success can be attributed to the walk-on program[.]" "Nebraska fields around 160 players each season ... which means that only half the team is on scholarship at a given time, limiting the chances of the average walk-on of nailing down a scholarship." "Due to the vast amount of bodies at practice, the Huskers are able to field four practice teams – two apiece for offense and defense.").

[50] "2003 American Football Coaches Association Survey," *supra* note 4, at 59-60; NCAA Bylaws § 17.11 (Playing and Practice Season, Football).

restrictions affect many of the off-field activities of student-athletes, including academic eligibility requirements, earning or receiving outside income, involvement with professional teams, the use of professional agents, the receipt of benefits, gifts and services, promotional activities, drug and alcohol use, and the overall amount of financial aid received.[51]

71.     Despite the significant financial and other sacrifices that the NCAA scholarship limit imposes on walk-on players, there are powerful incentives that compel players to walk on to a Division I-A team.  Playing for a Division I-A college football team has many short and long-term benefits that are extremely attractive to student athletes.  It can lead to the opportunity to earn a living playing football in the NFL or in a number of other professional football leagues including the Canadian Football League and NFL Europe.  Furthermore, participating on a Division I-A football team can engender a lifetime network of friends and contacts within the leadership of a community.  Prospective players know that University alumni, former coaches, and others will form a network of important connections that will help them succeed later in life.

72.     Division I-A teams do not allow just any interested student to participate.  There are costs associated with every roster participant, including coaching time, uniforms and equipment costs, and training facilities.  Nevertheless, on average during the past twenty years Division I-A football roster sizes have not diminished substantially as a result of scholarship limits.  In 2001-02, the average roster size of a Division I-A football program was 117.5, meaning that an average of more than 32 student athletes who participated on each football team were denied an athletic scholarship.[52]  And some Division I-A schools, such as the University of Nebraska, have nearly doubled the size of their football squads using uncompensated walk-on

---

[51] NCAA Bylaws, Article 12 (Amateurism), Article 15 (Financial Aid Limitations), and Article 16 (Awards, Benefits and Expenses).  All of these restrictions apply to "student athletes." An unrecruited student (*i.e.*, a "walk-on") becomes a regulated "student athlete" when they "report for an intercollegiate squad that is under the jurisdiction of the athletics department."  NCAA Bylaws § 12.02.5.

[52] *See* "Sponsorship and Participation Report," *supra* note 8, at 61.

CLASS ACTION COMPLAINT                         - 22 -
Case No.
1760 10 0008 BSC DOC

players.[53]  But for the restraint on the number of scholarships, these walk-ons would have received scholarships.

73.    The Division I-A scholarship limits have not improved "parity" among Division I-A football programs.  The scholarship limits were developed to contain costs by reducing the expenditures needed to maintain a big-time college football program.  They were not developed in an effort to increase competitive balance in college football.  Moreover, scientific analyses have concluded that the NCAA's restrictions on scholarships to student athletes have actually decreased parity and helped to maintain the most successful programs at the expense of lesser schools.[54]

74.    Another ill effect of the restraint is to limit the number and types of athletes who can obtain a college education.  Poor players are less likely to obtain a college education if they must play as walk-ons because they may be unable to pay for tuition.

75.    The more powerful football programs attract the best walk-on players and can afford to maintain the largest roster of walk-ons, which benefits the program as a whole.  The richest football programs can also afford to build the best facilities and hire the best coaches, which are key elements of program success that the NCAA has left completely unregulated.

76.    Absent the imposition of the restraint, there would have been free and vigorous competition for the services of the walk-on players.  Schools desiring to get ahead of another program would have offered more scholarships than the number allowed by the restraint.  Other schools would have responded in kind and prior to the start of the Class Period, as a result of competition, all Division I-A schools would have had a full roster comprised of scholarship football players.  As a result of the restraint, the NCAA and its members have saved hundreds of millions in scholarship monies they would have paid in a market where free competition had

---

[53] *See Walkabout, supra* note 49.

[54] *See* Sutter and Winkler, *supra* note 40; *see also* Eckard, *supra* note 18.

been allowed to occur. Such expenditures would not have put a dint in the commercial success of Division I-A football.

77.     Every year, the NCAA overtly reaffirms and recommits itself to its restraints on intercollegiate athletics, including the 85-scholarship restraint imposed on Division I-A football. Once a year, the NCAA publishes the "NCAA Division I Manual." The manual is distributed annually to NCAA member institutions and the NCAA expects those institutions to adhere to all of the restraints contained therein. The manual contains the NCAA's Constitution, its Operating Bylaws, and its Administrative Bylaws. Each publication reflects legislative changes approved by the NCAA during the last year. The NCAA Manual is published with an "effective date." On that date, the new manual replaces the old manual as the NCAA document controlling intercollegiate athletics.[55]

## FIRST CLAIM FOR RELIEF

### SHERMAN ACT SECTION ONE: COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE RULE OF REASON

78.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs with the same force and effect as if here set forth in full.

79.     Beginning in or about 1977, the exact date unknown to plaintiff, and continuing thereafter until the filing of this complaint, defendant NCAA and NCAA member schools have continually engaged in an unlawful contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

80.     The combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the NCAA conspirators, the substantial terms of which have been to limit the number of Division I college football scholarships that any member school can award.

---

[55] *See* NCAA Bylaws § 5.3.2.3.3: "Final Action. Once the adoption of the legislation has become final, it shall be published and incorporated into the next annual edition of the NCAA manual."

81.    At all times, the NCAA conspirators had monopoly power and/or market power and/or economic power in the relevant market for Division I-A big-time college football.

82.    The NCAA limit on scholarships has as its purpose and effect the reduction in the costs of producing college football games and the elimination of competition on the basis of scholarship offers to plaintiff and members of the Class.

83.    The continued employment of this horizontal restraint of trade achieves no legitimate benefit to counterbalance its demonstrated anticompetitive effect of foreclosing competition in the market for college football players. The limit on athletic scholarships does not improve parity in college football or provide any other pro-competitive effect within the relevant market. By serving only to limit the cost of running a big-time college football program at the expense of college football players, the scholarship limit has a significant and unreasonable anti-competitive effect on the nationwide college football market.

84.    Because the NCAA has placed no limits on college football revenues or expenditures other than the scholarship limits, major college football powerhouses continue to succeed disproportionately in the relevant market.

85.    The combination and conspiracy has been effectuated by the means and overt acts set forth above, among others.

86.    The NCAA conspirators and others acting in concert with them intended by their actions to:

(a)    reduce the cost of producing big-time college football games;

(b)    reduce, limit and foreclose competition in the market for college football players on the basis of scholarship offers; and

(c)    injure competition in the college football market.

87.    The combination and conspiracy has had and/or is likely to have among other things, the following effects:

(a)     actual and potential competition in the college football market has been limited, reduced, restrained, and suppressed;

(b)     the costs of producing big-time Division I-A football have been artificially reduced;

(c)     plaintiff and the Class have been denied scholarships that would have been awarded to roster players in a free, open, competitive and unrestrained college football market.

88.     As a result of the NCAA and its members' violations of Section 1, plaintiff and the Class have been injured in their business and property

89.     Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiff has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**

**SHERMAN ACT SECTION TWO:  MONOPOLIZATION**

90.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs with the same force and effect as if here set forth in full.

91.     In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the NCAA has monopolized the big-time college football market.

92.     The NCAA's abuse of its monopoly power in this market has been effected by the means and the overt acts set forth above, among others.

93.     The NCAA has abused its monopoly power and has:

(a)     reduced, limited and foreclosed actual and potential competition in the big-time college football market; and

(b)     controlled and limited the maximum number of college football scholarships.

94.     The NCAA's monopolization of the relevant market has had, or is likely to have, among other things, the following effects:

(a)     actual and potential competition in the relevant market has been limited, reduced, restrained and suppressed;

(b)     Division I-A non-scholarship football players have been deprived of free and open competition for athletic scholarships to play football;

(c)     NCAA schools have succeeded in reducing the costs of producing big-time college football contests below that which would have prevailed in an open, competitive and unrestrained market; and

(d)     instead of a free, open and competitive big-time college football market, a monopoly has been established and maintained.

95.     As a result of the NCAA's violations of Section 2, plaintiff and the Class have been injured in their business and property.

96.     Such violation and effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiff has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### SHERMAN ACT SECTION TWO: CONSPIRACY TO MONOPOLIZE

97.     Plaintiff repeats and realleges the preceding allegations with the same force and effect as if here set forth in full.

98.     In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the NCAA, the NCAA conspirators and co-conspirators, have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the big-time college football market.

99.     The combination and conspiracy to monopolize this market has been effected by the means and the overt acts set forth above, among others.

100.    The NCAA, the NCAA conspirators and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified above.

101.    As a result of the conduct alleged herein, the NCAA and the NCAA conspirators have been able to reduce their costs of producing big-time college football contests below that which would have prevailed in an open, competitive market.

102.    The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects specified above.

103.    As a result of the NCAA's and the NCAA conspirators' violations of Section 2, plaintiff and the Class have been injured in their business and property.

104.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiff has no adequate remedy at law.

### IX.    PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands:

A.    That the Court declare, adjudge and decree that defendant has committed the violations of federal law alleged herein;

B.    That the Court enter an order pursuant to Rule 23 of the Federal Rules of Civil Procedure permitting this action to be maintained a class action on behalf of the Class specified herein;

C.    That defendant, its directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly continuing or maintaining the arrangement limiting the maximum number of Division I-A football scholarships; that defendant, its directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly committing other violations of Sections 1 and 2 of the Sherman Act, in which they and co-conspirators have been engaged; and that defendant, its directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect.

D.    That the Court award damages sustained by the plaintiff and members of the

Class in an amount to be proved at trial, to be trebled according to law, plus interest, attorneys'

fees and costs of suit;

E.    That the Court award plaintiff its costs and prejudgment interest and such other

and further relief as this Court may deem just and proper.

DATED:    May 24th, 2004.

IVEY & RAGSDALE

By

Garve Ivey, Jr.
Barry A. Ragsdale
William Adair, Jr.
P.O. Box 1349
315 West 19th Street
Jasper, AL 35502-1349
205-221-4644
garve@iveyragsdale.com

Steve W. Berman
George W. Sampson
Jay Carlson
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

Simeon J. Osborn
OSBORN SMITH, PLLC
2125 Fifth Avenue
Seattle, WA  98121
(206) 441-4110

Gordon Ball
BALL & SCOTT
Bank of America Center
550 Main Avenue, Suite 750
Knoxville, TN  37902
(865) 525-7028

Attorneys for Plaintiff and the Proposed Class